**FILED**
JAMES J. WALDRON,
CLERK

MAY 5, 2011
U.S. BANKRUPTCY COURT
NEWARK, N.J.

By:  s/Margaret Cohen
Deputy

<u>**FOR PUBLICATION**</u>

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re | Chapter 13 |
| MARIA C. KARAGIANNIS, | Case No.   10-23800 (MS) |
| Debtor. | Judge Morris Stern |

<u>**OPINION**</u>

<u>**APPEARANCES**</u>

Eugene D. Roth, Esq.
2520 Highway 35, Ste. 307
Manasquan, NJ  08736
Attorney for Debtor

Giordano, Halleran & Ciesla, PC
Donald F. Campbell, Jr., Esq.
125 Half Mile Road
Red Bank, NJ  07701
Attorneys for Creditor Crown Bank

**HONORABLE MORRIS STERN**

The immediate matter before this court centers on the rights, if any, of a mortgagor in a

"commercial" context to receive a fair value credit against mortgage debt following a sheriff's

sale of two properties.  At the sale the mortgagee successfully bid only a nominal $100 amount

for each property.  There is clear evidence that the properties had substantial value and perhaps

value approaching the amount of that debt.  Afterward, the rule-created ten-day objection period

passed and the sheriff's deeds were delivered, all without objection to the sale having been raised by the mortgagor.

The bank-mortgagee now asserts, as an absolute matter, that the mortgagor has no rights to any credit for the value of real estate the bank acquired for a nominal sum at the sheriff's sale, and that the full mortgage debt remains due. The bank's ostensible authority is the 2010 Superior Court of New Jersey Appellate Division opinion in *Borden v. Cadles of Grassy Meadows II, LLC*, 412 N.J. Super. 567. That opinion, in a case with active facts dramatically different from the case at bar, disagreed with the oft-cited 1991 dictum of another Appellate Division panel in *Citibank, N.A. v. Errico*, 251 N.J. Super. 236, 248. The intra-court discord concerns the allowance of a fair market value hearing (known as a "*Lowenstein* hearing"[1]) in a deficiency action *subsequent* to the objection period of New Jersey Court Rule ("R.") 4:65-5.[2]

---

[1] *Federal Title & Mortg. Guar. Co. v. Lowenstein*, 113 N.J. Eq. 200 (Ch. 1933) ("*Lowenstein*"). In the depths of the Great Depression, the foreclosing mortgagee bid $100 at a sheriff's sale purchasing property on which the mortgagee was due over $41,000. In refusing to confirm the sale, the court held:

> The mortgagee will not be permitted to retain the estate which will, in effect, become absolute in him upon confirmation of the foreclosure sale, and also recover the debt which is the consideration of that estate by an action on the bond, except and until he credits upon that bond the fair value of the mortgaged premises so acquired by him. Confirmation will be withheld unless and until the complainant purchaser stipulates that the fair value of the mortgaged premises . . . will be credited on the decree and deficiency suit prosecuted only for the balance thereof.

*Id.* at 209. *See also Young v. Weber*, 117 N.J. Eq. 242, 244 (Ch. 1934) (announcing "the rule of the *Lowenstein* Case"); *Crane v. Bielski*, 15 N.J. 342, 346 (1954) (adopting the Lowenstein Rule, holding that "[q]uite independent of statute or rule of court, the Court of Chancery has inherent power to order a sale of mortgaged premises and to control its process directed to that end, and this inherent power of the court has never been doubted").

[2] 4:65-5. Sheriff's Sale; Objections

> A sheriff who is authorized or ordered to sell real estate shall deliver a good and sufficient conveyance in pursuance of the sale unless a motion for the hearing of an objection to the sale is served within 10 days after the sale or at any time thereafter before the delivery of the conveyance. Notice of the motion shall be given to all persons in interest, and the motion shall be made returnable not later than 20 days after the sale, unless the court otherwise orders. On the motion, the court may

The *Borden* panel decided against allowing such a hearing, stressing (on its facts) its view of a bygone requirement to resolve such value issues in the foreclosure proceeding and through the sale objection mechanism.  Does this emphasis on process deny obligors on commercial mortgage notes (after sheriff's sales) fair value credit against their note obligations outside the objection period and mechanics of the Rule (as little as ten days and by motion), without consideration of equities and notwithstanding the possibility of oversatisfaction of debt?

This court does not believe that the bankruptcy context of this case allows for such a rank unfairness.  Nor will this court conclude, even absent bankruptcy, that venerable New Jersey equity jurisprudence has been subordinated to the absolutism of process, as the bank would interpret *Borden*.  New Jersey law, *i.e.*, the applicable law, continues to permit fair value hearings in cases such as the one at bar, *Borden* notwithstanding.[3]

## I.   <u>FACTS</u>

Debtor, co-owner of a residence and three rental properties in Union County, filed a Chapter 13 petition in bankruptcy on May 4, 2010.  On June 24, 2010 Crown Bank, holder of a blanket mortgage covering all of the properties, filed a motion in the case seeking an order granting relief[4] from the automatic stay of 11 U.S.C. § 362(a) to pursue its rights in the real property (foreclosure).

Impetus for the bankruptcy case appears to have been a foreclosure judgment obtained by the bank on December 17, 2007; that judgment does not provide for personal liability of the

---

summarily dispose of the objection; and if it approves the sale and is satisfied that the real estate was sold at its highest and best price at the time of the sale, it may confirm the sale as valid and effectual and direct the sheriff to deliver a conveyance as aforesaid.

[3] This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1334(b) and this District's July 23, 1984 Order of Reference.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A),(B),(G) and (O).

[4] Among other relief sought was conversion of the case to Chapter 7 or 11 based upon the debt limits of 11 U.S.C. § 109(e).

debtor (or the co-debtor, her mother).  Rather, it fixes the sum due and to be "raised and paid out

of the three (3) mortgaged premises"[5] by sheriff's sale, forecloses the equity of redemption, and

provides for possession in the purchaser following the sale.  The scheduled sale was interdicted

by the filing of the bankruptcy petition.

Applicable Chapter 13 eligibility limitations are a maximum of $1,081,400 of

noncontingent, liquidated secured debt, and a cap of $360,475 of like unsecured debt.  Crown

Bank's debt amount was scheduled as "unknown" on the petition's Schedule D ("Creditors

Holding Secured Claims").  In motion response papers, this lack of important detail was

explained as being the result of the debtor's inability to get a payoff statement from the bank.

Apparently, as set forth in the debtor's certification in response to the bank's June 2010 motion,

her family's banking relationship with Crown had a long and difficult history.  It was punctuated

by the condemnation at less-than-hoped-for compensation of a property in Rahway which had

been part of the financed "package" of real estate, a failed bankruptcy by Maria's co-debtor

mother, and unsuccessful settlement negotiations.  Filing to avoid sheriff's sale of three

properties, the debtor immediately proposed a plan of rehabilitation calling for the sale of all

properties except the residence occupied by the mother and daughter.

The bank's motion was in part premised on the absence of equity in its collateral, the four

then-remaining mortgaged properties.  Its claim asserted in the motion was $1,130,373.13.

Crown measured *total* secured and would-be secured claims against the properties at

$1,351,281.49[6] and the combined value of the mortgaged properties subject to the bank's blanket

---

[5] The residence was not included in this foreclosure.

[6] This debt total includes $176,320.90 scheduled by the debtor as mortgage debt on the Sycamore
Street residence due to other lenders.  Crown is said to hold a second mortgage (of three) on the
residence, junior to a $101,242.35 first mortgage but senior to one of $75,078 (which appears to be
unsecured).  There also appears to be, by the bank's accounting per its 2010 motion support documents,
$44,595.40 of other tax, sewer and water liens on various of the properties.  The bank claim of

debt and other debt at $1,205,000 (per appraisal reports running from May 8 to May 14, 2010).

More specifically, the bank's motion-supporting appraised values (compared to those values then

attributed to the properties by the debtor), are as follows:

| | |
|---|---|
| 713 Sycamore Street, Rahway[7] | $300,000 (v. $320,000 by debtor) |
| 414-20 Magie Avenue, Elizabeth | $325,000 (v. $525,000 by debtor) |
| 622 East Jersey Street, Elizabeth | $280,000 (v. $640,000 by debtor) |
| 2114 Grier Avenue, Linden[8] | $300,000 (v. $505,000 by debtor)[9] |

At a hearing on July 15, 2010 the concept of relief from the stay as to two properties

(anticipating sheriff's sale of Magie Avenue and East Jersey Street) was discussed; that approach

was to lead to greater clarity regarding the net amount due (if anything) on the residence and the

business property in which the debtor and/or her family operated a tavern, both to remain subject

to the stay.  A cryptic stay relief order memorializing this approach was entered on August 5,

2010.[10]

On September 7, 2010 the bank filed a proof of claim.  It again set forth the debt amount

of $1,130,373.13.  The four properties were again valued at the combined $1,205,000, allocated

per its May 2010 appraisals.  The next day, September 8, 2010, there was a sheriff's sale of the

two properties no longer subject to the stay; in each sale there was apparently no active bidding[11]

and the bank was successful with nominal bids of $100 per property.  No objection to the sale

---

$1,130,373.13 (again, in its 2010 motion), was allocated $1,059,170.19 as secured and $71,202.94 as unsecured.  (These figures are reflected on the face page of Crown's September 7, 2010 filed proof of claim, where the attachments simply replicated the accounting of debt and equity provided in its 2010 stay relief motion.)

   [7] This is the residence of the debtor and her mother, co-owned by them.
   [8] This is the business property in which the debtor or her family had operated a tavern.
   [9] Debtor's values for Magie Avenue, East Jersey Street and Grier Avenue are from appraisals submitted in response to Crown's 2010 motion, with appraisal dates ranging from June 30, 2007 (Magie Avenue and East Jersey Street) to July 22, 2007 (Grier Avenue); value for the Sycamore Street residence is taken from the petition.
   [10] Conversion of the case was denied "at this time."
   [11] The court notes that the sale was the Wednesday following Labor Day (September 6, 2010).

was raised by the debtor or co-debtor within the ten-day (or extended) period[12] established by

R.4:65-5.

Crown Bank now moves again for relief from the stay (and conversion), seeking access

to the residence and tavern properties.  Embedded in the motion and the response to it are the

questions of entitlement to a credit for the fair value of each previously sold property against the

overall debt due the bank by the debtor, and, if credit is due, the amount of the credit.   Crown

maintains that the *Borden* case bars the debtor from receiving anything more than the nominal

$200 credit against the overall debt of approximately $1.1 million.[13]  Debtor claims credits for

the sold properties based upon newly submitted appraisals (as of August 15, 2010) of $620,000

for East Jersey Street and $450,000 for Magie Avenue.  Moreover, Magie Avenue suffered a

seemingly totally destructive fire in November 2010 (following the September 8, 2010 sheriff's

sale), generating gross insurance proceeds collected by the bank of $325,000.  The bank has not

up to this point chosen to put appraisals into the record (other than those submitted for its first

motion in 2010).  It is clear that each  property conveyed to the bank had a value greatly in

excess of $100, and that the more than $1 million combined value asserted by the debtor as per

filed appraisals is not necessarily meritless.

## II.   DEVELOPMENT OF THE APPLICABLE LAW

### A.  The *79-83 Thirteenth Ave.* Case

The modern era of New Jersey mortgage law is rooted in the 1965 case of *79-83

Thirteenth Ave., Ltd. v. DeMarco*, 44 N.J. 525.  There the Supreme Court acknowledged that the

---

[12] This period could be as little as ten days but is extended up to "any time thereafter before the delivery of the conveyance."  The record is not clear as to when the sheriff provided the deeds to the bank.

[13] Crown Bank amended its proof of claim on February 7, 2011 to $1,115,669.37.  It valued  its combined interest in Sycamore Street and Grier Avenue, the debtor-retained properties, at $496,682.17 per its appraisals ($600,000) *less* the superior mortgage on the residence ($101,242.35) , to derive its secured claim (*stated as* $496,682.17) and its unsecured claim (*stated as* $618,987.20).

then applicable statutory right[14] to fair market valuation was limited to mortgage-bond

transactions (as distinguished from mortgage-*note* transactions).  The omission of note

mortgages from the statutory scheme was viewed as an anachronism harking back to "as long

ago as 1880."  *Id*. at 530.  The note-bond distinction was seen as "an illogical, incongruous and

indeed unjust triumph of form over substance, at least in those cases where the [note] lender

relies primarily upon the value of the mortgaged property" or where the note has the essential

characteristics of a traditional bond.  *Ibid*. (footnote omitted).  Among the differing consequences

addressed in *79-83 Thirteenth Ave.* was the free hand of the mortgage note holder to choose his

remedy – suit at law first on the note or foreclosure first.

> Under either procedure in the case of a note, he may seemingly
> himself acquire the property at the judicial sale for a nominal
> figure (if there are no other bidders), and still collect the full
> deficiency out of his debtor's other property during the next 20
> years.

*Id*. at 533.  Thus, the Supreme Court specifically identified note holder acquisitions for nominal

bids without fair credit being provided to debtors as an "injustice."  *Ibid.*

The bondholder's statutory order of proceeding and remedy was foreclosure to be

followed by suit for deficiency "limited to the difference between the fair market value of the

property and the debt regardless of the price received for the property at the foreclosure sale, the

absence of objection to the sale or the equities of the situation."  *Id*. at 532-33.  Suit for

deficiency was to be at the mortgagee's initiation within three months following sale (or

confirmation of sale if required); if not so initiated, the right to a deficiency shall have been lost.

The mortgagor in a *bond* mortgage transaction thus had two distinct statutory benefits over the

note mortgagor: foreclosure was required first (before suit on the bond) in the order of

---

[14] *See* L.1880, c.170 § 2, codified as N.J.S.A. 2A:50-2 and 3 and amended periodically.

7

proceeding; and, the mortgagee had the burden of bringing the deficiency suit within the prescribed period.

The "incongruity and injustice" of limiting such statutory coverage to bond mortgages was seen as an affront to policies regulating deficiencies in favor of mortgagors.  And, most pertinent *sub judice*, the Court expressed its concern for what it characterized as a "fundamental principle."

> Nor in any consideration of this problem [of differing bond-note consequences] can we overlook the broad equitable concept that a mortgagee is not entitled to recover more than the full amount of the mortgage debt.

*Id*. at 534.

Justice Francis, concurring, addressed the matter as follows:

> In the run-of-the-mill mortgage transactions, a great mass of which involves ordinary homeowners, the factor motivating the lender is the value of the property offered as security for the loan. . . . Since the land plays such a paramount role it seems reasonable to say in terms of equitable principles that a defaulting mortgagor-owner ought to have an equity in the transaction calling for utilization of the fair value of the land in diminution of the debt.

*Id*. at 537.

And so, absent much needed legislation, equitable principles were employed by the Court:

> We agree that a note mortgagor today, although prevented from automatic application of the fair value deduction statute with reference to a deficiency, may obtain review and relief, including reduction of the difference between the mortgage debt and the amount realized at the foreclosure sale, on appropriate equitable bases.

*Id*. at 535.

Then, in a passage emphasized in *Borden*, the Court went on:

> We further acquiesce in the conclusion that the forum for such
> relief should be only the foreclosure action by the procedure of
> objection to the sale.  We say this because the evidence can there
> be promptly presented in a court of equity and especially since the
> appropriate relief may be the ordering of a resale which could not
> well be done months or even years later by the law court in the
> deficiency suit.

*Ibid*.  However, later developments in procedure would seem to have affected the Court's

acquiescence. *See* R.4:64-5 and R.4:30A, as well as related comments.  In particular, *see*

R.4:65-5 Comment 1, which is in opposition to this passage.

### B.  The *Schwartz* Case, Proposed R.4:64-5 and the 1979 Legislation

The knotty *dual problems* of order of proceeding and deficiency/fair valuation hearing

were addressed again in *Schwartz v. Bender Invs., Inc.,* 58 N.J. 444 (1971).  *Schwartz*, like *79-83*

*Thirteenth Ave.*, pressed for a legislative solution to the incongruity.  A failed legislative effort

from 1965 was cited as an attempt "to give the makers of a note the same protection in a

deficiency suit that the obligors of a bond now have."  58 N.J. at 447.  Again, in 1969 a similar

bill was introduced and again it failed.[15]  *Ibid*.  On the heels of this second legislative attempt,

---

[15] The decision in *Schwartz* cited in relevant part the statements accompanying the failed amendments to
N.J.S.A. 2A:50-1 *et seq*., first to Assembly No. 755 introduced in 1965 (one week before *79-83
Thirteenth Ave.* was published):

> The purpose of this statute is to prevent a multiplicity of actions for the
> recovery of a debt secured by a mortgage and to require exhaustion of
> the security afforded by a mortgage before a personal action may be
> brought upon the debt and *to give the makers of a note the same
> protection in a deficiency suit that the obligors of a bond now have*.

*Schwartz*, 58 N.J. at 447 (emphasis added by *Schwartz* to original).  The Court also cited the statement to
Assembly,  No. 925 introduced in May 1969:

> This bill incorporates the recommendations of the courts and would
> eliminate the distinction between mortgages securing bonds and
> mortgages securing notes.

*Id*. at 447.  According to *Schwartz* the proposed statutory amendments never left committee.  *Ibid*.

the Court "tentatively undertook to deal with *one phase of the problem* by the promulgation of a rule requiring that a mortgagee holding a note and mortgage must first foreclose the mortgage before bringing suit on the note." *Id*. at 447-48 (emphasis added).  That rule proposal was not adopted.[16]  Significantly, the iteration of R.4:64-5 which was adopted *appeared in 1992*.  It provided in pertinent part then (as it does now) that "claims on the instrument of obligation evidencing the mortgage debt" were "non-germane" and could not be joined with claims for foreclosure of mortgages without court order.  The origin of this rule as to *joinder* (the 1991 *Citibank* opinion of the Appellate Division) rather than *order of proceeding* (as proposed in 1969 and discussed in *Schwartz*) is likewise significant.

Finally, in 1979 the Legislature acted to deal in part with the incongruity between note and bond mortgage foreclosures.  Effective May 1, 1980, N.J.S.A. 2A:50-2 and 3 provided for the following consistent treatment:

> **2A:50-2**.  **Order of proceedings; foreclosure; action on bond or note; limitations; parties**
>
> Except as otherwise provided, all proceedings to collect any debt secured by a mortgage on real property, shall be as follows:
>
> First, a foreclosure of the mortgage; and

---

[16] The text of *proposed* R.4:64-5 cited in *Schwartz* is:

> No action for recovery on a note or other instrument secured by a mortgage on real estate or an interest therein shall be brought against the maker, endorser or guarantor thereof until the mortgage shall have been first foreclosed or extinguished by the foreclosure of a prior mortgage or lien.  This rule does not supersede any provisions of N.J.S. 2A:50-2, 2A:50-8, or 2A:50-22 (actions on bonds secured by mortgage).

*Id.* at 448.  The Court in *Schwartz* stated that criticism of proposed R.4:64-5 led to its deletion from the proposed 1969 rule revision.

Second, an action on the bond or note for any deficiency, if, at the sale in the foreclosure proceeding, the mortgaged premises do not bring an amount sufficient to satisfy the debt, interest and costs.

The action for any deficiency shall be commenced within 3 months from the date of the sale or, if confirmation is or was required, from the date of the confirmation of the sale of the mortgaged premises.  In such action judgment shall be rendered and execution issued only for the balance due on the debt and interest and costs of the action.

No action shall be instituted against any person answerable on the bond or note unless he has been made a party in the action to foreclose the mortgage.

### 2A:50-3. Answer disputing amount of deficiency; determination of amount

The obligor in any bond or note specified in section 2A:50-2 of this Title . . . may file an answer in the action for deficiency, disputing the amount of the deficiency sued for.  In that event both parties may introduce evidence as to the fair market value of the mortgaged premises at the time of the sale thereof in the foreclosure action, and the court . . . shall determine the amount of such deficiency, by deducting from the debt secured the amount determined as the fair market value of the premises.  If all parties to the action shall so agree, the court may accept as the fair market value of the mortgaged premises the value fixed by three appraisers, to be named by agreement of all the parties to the action, which agreement shall be evidenced by a stipulation to be filed in the action.

These provisions, however, were limited to *residential* mortgages per N.J.S.A. 2A:50-2.3, thus roughly (but not exactly) reflecting Justice Francis' concerns in his *79-83 Thirteenth Ave.* concurring opinion.

### C.  The *Citibank* Case and the Adoption of R.4:64-5

Rule change in 1992 formalized the shift from the proposed but unadopted "foreclose first" version of R.4:64-5 to the following "germane"/"non-germane" distinction for joinder of claims in foreclosure:

### 4:64-5.  Joinder of Claims in Foreclosure

> Unless the court otherwise orders on notice and for good cause shown, claims for foreclosure of mortgages shall not be joined with non-germane claims against the mortgagor or other persons liable on the debt.  Only germane counterclaims and cross-claims may be pleaded in foreclosure actions without leave of court. Non-germane claims shall include, but not be limited to, claims on the instrument of obligation evidencing the mortgage debt, assumption agreements and guarantees. . . .

Hence, options were retained for the mortgage note holder: either sue first on the note or foreclose first.

In fact, *Citibank* helped spawn more than the joinder rule (R.4:64-5) in foreclosure actions.  The case serves (and since 1992 has served) as precedent for important rule commentary.  *See* R.4:30A "Entire Controversy Doctrine"[17] and R.4:65-5 "Sheriff's Sale; Objections."  The current Comment 1 to this last rule states flatly that "*a mortgagor's failure to object to the sale price [garnered at a sheriff's sale] will not preclude him from claiming, in a subsequent deficiency suit, that the price is below fair market value.*" (Emphasis added).  *See also* Comment 5.6 to R.4:30A.  Hence, the *Citibank* opinion (right, wrong or indifferent as to its interpretation of *79-83 Thirteenth Ave.*) substantially prompted the guiding procedure for commercial foreclosure deficiency hearings from *at least* September 1992[18] to this day.

*Citibank* involved a commercial mortgage foreclosure based upon a New York choice of law provision included in the transaction documents.  Following the entry of the foreclosure judgment but before sale, a bankruptcy petition was filed by two of the three mortgagors (the

---

[17] Rule 4:30A.  Entire Controversy Doctrine
> Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R.4:64-5 (foreclosure actions) and R.4:67-4(a) (leave required for counterclaims or cross-claims in summary actions).

[18] As will be demonstrated, *Citibank* was formative even before the dates of adoption and implementation of the 1992 rule changes.

Elsaids).  In bankruptcy, the mortgagee-bank established its claim at $7.1 million plus interest, fees and costs.  The bank's appraisal for the property (prepared in connection with the bankruptcy) was $9.5 million.

After stay relief, the property was sold at auction to the bank (the only bidder) at $5.9 million.[19]  The nonbankrupt mortgagor, Errico, did not object to the auction price.  Thereafter, the bank sued Errico seeking a deficiency judgment.  He asserted his right under New York law to a fair market value credit of $9.5 million, thus eliminating any deficiency.[20]

The bank successfully argued at the trial level that New York deficiency law was "procedural," that under New Jersey law Errico was not entitled to a statutory fair market value credit in this commercial transaction, and that his failure to object to the foreclosure sale price at the time of the sale precluded his defense to the deficiency.  "Without distinguishing between the foreclosure action and the deficiency action, [the trial judge] concluded that New Jersey law should apply," and summary judgment for the mortgagee was warranted.  251 N.J. Super. at 241-42.

On appeal, the Appellate Division determined that deficiency provisions of the New York law were substantive.  However, that court held (in reversing) that regardless of the procedure/substance divide, use of the New York anti-deficiency law in *commercial* contexts did not violate any policy reflected in the N.J.S.A. 2A:50-2.3 limitation (to *residential* transactions).  The court then added the following:

> Even in the absence of the contractual provision applying New York law, Citibank's argument that there is no entitlement to a fair market value credit in a deficiency action in New Jersey on a note

---

[19] The sale appears to have been at auction in the bankruptcy court.

[20] N.Y.R.P.A.P.L. § 1371, subdivisions 1-3 (McKinney 2008).  This section runs largely parallel to N.J.S.A. 2A:50-2 and 3, but unlike the New Jersey restriction of applicability to residential mortgages, the New York law appears to apply in commercial contexts as well.

> where business or commercial property is involved is not a correct statement of our law.  Although *N.J.S.A. 2A:50-2.3* was amended to exempt mortgages secured by notes for business and commercial properties from the fair market credit provision, we find nothing which precludes a court from applying equitable principles to impose a fair market value credit to prevent a windfall or where circumstances require equitable relief in the interests of justice. . . . As we have noted, the Chancery Division applied equitable principles in conditioning relief on a fair market value hearing in *Central Penn National Bank v. Stonebridge, Ltd.*, [185 *N.J. Super*. 289, 311 (Ch. Div. 1982)].  An equity court has the inherent power to prevent a potential double recovery or windfall to a judgment creditor.  *Morsemere Federal Savings & Loan Ass'n* [v. Nicolau, 206 N.J. Super. 637 (App. Div. 1986)].  *Morsemere* recognized that the court has equitable powers to mold relief.  Although the deficiency suit here was instituted in the Law Division, rather than the Chancery Division, under our constitution each court has the ability to fashion equitable remedies. . . . We also note that the property involved in *79-83 Thirteenth Avenue Ltd. v. DeMarco* . . . (a case decided before the amendments to the deficiency statutes), was commercial property but nonetheless, the court noted the inherent unfairness of the situation and applied traditional equitable principles.   Such principles were also followed in *Central Penn National Bank,* decided after the amendments, which likewise involved business property.  This analysis is particularly apt where the evidence of the security value being in excess of the debt was derived not from the debtor, but from the creditor.

*Id*. at 246-47 (citations omitted).

The *Citibank* court thus went on to reverse and remand for a deficiency hearing at which fair market value was to be calculated and credited, basing its decision on the following *alternative* grounds:

> We conclude that, in accordance with the agreement by the parties in the note and mortgage, New York law applies to the deficiency claim, *and that alternatively, under the circumstances here, New Jersey law allows a deficiency hearing to preclude a windfall under general equitable principles*.  Accordingly, we remand for a deficiency hearing at which the fair market value of the property at the time of foreclosure sale shall be determined and the calculation of any credit to be allowed defendant in the deficiency action.

*Id*. at 248 (emphasis added).  Of course, the equitable alternative ground would support the

debtor-mortgagor *sub judice*.

Ultimately, *Citibank* addressed the entire controversy doctrine and the issue of whether a

defense to personal liability on a mortgage note (*i.e.,* the fair market value credit) was germane

to the foreclosure action (or the matter in bankruptcy).  As to entire controversy, the opinion

offered the following:

> Although the foreclosure judgment sets the amount due on the debt
> and may be *res judicata* among the parties, it is not determinative
> as to the debtor's liability for a deficiency in a separate suit. . . . A
> claim that no personal liability exists, *e.g*., that the fair market
> value of the property exceeds the mortgage debt, is a personal
> defense which is properly asserted in the deficiency action. . . . *To
> assert it in a foreclosure proceeding would be premature.*[21]

*Id.* at 248 (citations omitted, emphasis added).  Then, melding its prior point about the doctrine

of entire controversy with the concept of "germane" pleading, the opinion continued:

> Likewise, a defense to personal liability on the note by virtue of a
> claimed fair market value credit is not germane to either the
> foreclosure action or the bankruptcy matter.    The entire
> controversy doctrine does not bar Errico's claim here. . . . Since the
> deficiency cause of action did not accrue until after the foreclosure
> proceeding, and until the property was sold for less than the
> amount owed on the note, there can be no bar by virtue of the
> entire controversy doctrine.

*Id*. at 249 (citations omitted).

As previously indicated, by July 1992 following the issuance of the October 16, 1991

decision in *Citibank*, the Supreme Court of New Jersey adopted new R.4:64-5 and amended

R.4:30A.  The 1993 edition of the *Rules Governing the Courts of the State of New Jersey* (Gann

Law Books), with Comments and Annotations (including Amendments to September 1, 1992) by

---

[21] *Borden* took umbrage at this emphasized proposition.

Judge Sylvia B. Pressler ("*Pressler")*, at p.993 of Comments to R.4:30A, specifically cited

*Citibank* for the following proposition:

> Note further that the [entire controversy] doctrine has been held inapplicable to issues raised in a deficiency action respecting the mortgagor's right to fair market credit even if not raised in the foreclosure action or by objection to the sale.

In a parallel comment to R.4:64-5, R.4:30A was cross-referenced (apparently relying on the

*Citibank* reference in commentary to that rule). And, most directly, *Citibank* was cited in

commentary to R.4:65-5 for the seemingly dispositive proposition that "*failure to object to the*

*sale price will not preclude" a claim to a credit for fair market value* (hereinafter "FMV") in a

subsequent deficiency suit.[22] Thus, the *Citibank* imprint on the court rules is evident. In fact, in

an unusual acceleration of the rule making process the Supreme Court issued a Notice to the Bar,

130 N.J.L.J. Index Page 358, 1 N.J.L. 95 (February 10, 1992) which, in plainly adopting the

*Citibank* reasoning, expressly excluded non-germane claims in mortgage foreclosure actions

from the effects of the yet unamended entire controversy rule, R.4:30A. In that Notice, the

proposed but not yet adopted R.4:64-5 was cited.

### D.  The *Borden* Case

*Borden* is a case with very different fundamentals than the case at bar. *At its roots, the*

*case does not involve a windfall or potential windfall to the foreclosing creditor. In fact, a third*

*party purchased at the sheriff's sale. Borden* arises out of a 1986 commercial mortgage loan

transaction, documented in part by a mortgage note. After loan default, a foreclosure suit was

instituted in December 1991. That date is, of course, *earlier than* the landscape-changing rule

---

[22] *See Pressler*, Comment R.4:65-5 (1993 Edition with amendments to September 1, 1992, published in 1992). This quoted provision has been a constant in the rule commentary from 1992, and remains intact today; *Citibank* was cited as its source initially, then at some point recently was dropped from the comment, only to be restored to Comment 1 (Objections to Sale) in the 2011 Edition (Release #119 published 2010 with amendments to September 1, 2010). The citation to *Citibank* is now followed by a "But see" citation to *Borden.*

amendments of 1992 (and before the Notice to the Bar of February 10, 1992).  Suit began only

shortly after the *Citibank* decision of October 16, 1991.

The foreclosure complaint, apparently including a claim for personal judgment against

guarantors on the note (and presumably the corporate maker), and the contesting answer and

counterclaim with its allegations of breach of representations, were the antithesis of germane

foreclosure pleading.  By granting summary judgment to the bank-mortgagee, judgment on the

note was entered against the guarantors for approximately $4 million.  Responsive pleadings

were struck and the matter was referred to the appropriate office for processing as an uncontested

foreclosure.  Any action to collect on the personal judgments against the guarantors (and the

corporate maker of the note), was stayed until a date certain (February 1, 1993, following the

July 17, 1992 judgment).

After the mortgagee went into receivership during the savings and loan debacle of the

early to mid-90s, the FDIC (in the mortgagee's "shoes") commissioned an appraisal of the

foreclosed realty available for sale (condominium units).  That September 19, 1994 appraisal set

the value at $1.25 million.

Protracted post-judgment settlement negotiations ensued.  They were not successful.  A

motion to stay the sale was initiated by the corporate defendant-mortgagor and the guarantors

(February 6, 1995), claiming loss due to delay in sale and other damaging acts of the rent

receiver and the FDIC.  Borden, as a guarantor, submitted an appraisal valuing the property as of

February 1, 1995 at between $3.7 million and $4 million (depending on whether the units were

renovated or not).

Ironically (but understandably given the *Citibank* imprint on the law during the long

pendency of the foreclosure), the FDIC pressed for the 1995 sale arguing that the guarantors

17

would not be prejudiced by the sale given the application of N.J.S.A. 2A:50-3 via equitable

principles applied by *Citibank* to commercial mortgage note obligors. 412 N.J.Super. at 573. On

February 17, 1995, the motion to stay the sale was denied. The order of denial provided that "in

any deficiency action defendants will be entitled to [an FMV] credit." *Id*. at 573-74.

At the March 1, 1995 sheriff's sale the rent receiver purchased the property for $640,035,

subject to tax arrears. This was thus a sale to a third party at other than a nominal price. The

defendants did not object to the sale per R.4:65-5. The FDIC took no further action regarding its

deficiency claim (which had grown to roughly $3.6 million even after crediting the sale price).

The 1992 personal judgment against multiple parties was first assigned to an FDIC

affiliate in 1998; one guarantor was pursued into bankruptcy by the assignee. Then, in 2001 the

judgment was again assigned to The Cadles Company.[23]  In 2007 Cadles docketed the

judgment[24] and then assigned it to a seemingly related LLC which, in turn, pursued Borden.

Borden (and his co-guarantor who had filed for bankruptcy) sued the LLC to prevent

enforcement of the judgment. They put forth their FMV credit right, backed by an "appraisal"

which was a 2007 hypothetical reconstruction of 1995 values. The judgment holder countered

with the $1.25 million appraisal from 1994 and that appraiser's testimony.

In sum, the trial court (now a different Chancery Division judge than the judge sitting in

1995) construed the February 17, 1995 order denying the stay of the sheriff's sale as preserving

the right to an FMV credit pursuant to *Citibank*. That order was deemed to be "the law of this

---

[23] This court has had experience with The Cadles Company; it is an enterprise which buys large blocks of old debt, often from banking institutions or their receivers (as in *Borden)* for pennies or even mills on the facial dollar of debt. Given the increased sophistication in computerized debt collection, debt which in earlier eras would have been allowed to pass into oblivion over a period of years now is often resurrected by this type of enterprise.

[24]*See generally* N.J.S.A. 2A:16-11 ("Civil judgment and order docket") and R.4:101-1 through 5; *see also* N.J.S.A. 2A:16-12 ("Recording of judgments, orders, and proceedings) and R.4:47.

case."  The trial judge tied the note obligors' right to assert FMV credit "were they pursued for any perceived deficiency" to delay (at least until 2007) in enforcement efforts.  The internal delay from 1995 to 2007 was deemed to be too long for initiation of a deficiency action; *the included assumption was that the assignee seeking enforcement of the judgment had the burden of initiating the action*.  The 1992 judgment of record was thus extinguished below by order of December 16, 2008.

On appeal, the Appellate Division viewed its role as being that of plenary reviewer of the February 17, 1995 order.  "We construe that order in accordance with the state of the law as it existed on and prior to" that date.  412 N.J. Super. at 580.  The court then undertook an extensive exposition of *79-83 Thirteenth Ave.* (a/k/a *DeMarco*).  Along the way, it was acknowledged that there was no entitlement to a recovery by a mortgagee of more than the full amount of the mortgage debt – this being in *79-83 Thirteenth Ave.'s* terms a "fundamental principle."  That principle had been the historic underpinning for the *Lowenstein* doctrine.  *Id*. at 582-83.  Notwithstanding this acknowledgment of a first substantive principle and recognition of "broad legislative policy" in ameliorating potential personal liability for a deficiency judgment by virtue of an FMV deduction, the *Borden* court chose to emphasize *79-83 Thirteenth Ave.'s* inclination to "acquiesce"[25] to placing FMV relief within the objection to sale procedure.  *Id*. at 583.  This emphasis on procedure is understandable, given that unlike *79-83 Thirteenth Ave.* and *Citibank* the note obligee in *Borden* was not the buyer at the sale.  Hence, there could be no supersatisfaction of the note debt or violation of the fundamental principle referred to in *79-83*

---

[25] The use by the Supreme Court of this term – generally defined as to assert or comply passively or without protest – bears deep consideration, particularly in light of rule changes adopted by this same court in 1992, as well as consistent rule commentary thereafter delinking the FMV right from the objection process.

*Thirteenth Ave.*  The *Borden* court went on to review *Schwartz* and the 1979 legislative fix to

N.J.S.A. 2A:50-1 through 4.

After synopsizing *Citibank* (a/k/a *Errico*), the *Borden* court offered the following

summary:

> [A]s of February 17, 1995, with the exception of the dicta in
> *Errico*, FMV credits as to commercial notes and mortgages have
> only been made available in foreclosure proceedings under *Rule*
> 4:65-5 and its predecessor rule when the mortgagor objects to the
> sheriff's sale and claims entitlement to an FMV credit.

*Id.* at 590.[26]  This statement, taken at face value and out of the factual context of *Borden*, would

have implications contrary to R.4:65-5 Comment 1 ("failure to object to the sale price will not

preclude" an assertion of FMV by the mortgagor "in a subsequent deficiency suit").  Yet, that

commentary has advised parties, the bar and courts since 1992.

This Appellate Division panel does, however, deal with facts very different from *Citibank*

(and the case at bar).  *Borden* reflects on the circumstances faced by the original Chancery judge

when he issued the 1995 order denying stay of sheriff's sale:

> The . . . judge knew he had earlier ruled on the counterclaims and
> affirmative defenses on July 17, 1992, all of which he struck with
> prejudice on a motion for summary judgment which entered
> judgment on the notes and guaranties.  He knew that left only the
> subsequently arising claims respecting waste of the assets.  He had
> before him [the Borden-submitted] February 1, 1995, appraisal
> opining on the then-current FMV.  He knew he had stayed levy on
> the judgment for a sum certain pending entry of the final judgment

---

[26] *Borden* details three pre-*Citibank* cases (*Hudson City Sav. v. Hampton Gardens, Ltd.*, 88 N.J. 16
(1981), *Central Penn Nat'l Bank v. Stonebridge Ltd.,* 185 N.J. Super. 289 (Ch. Div. 1982), and
*Morsemere, supra,* (App. Div. 1986)), and one post-*Citibank* case (*Summit Trust Co. v. Willow Bus. Park,
L.P.*, 269 N.J. Super. 439 (App. Div. 1994)), to reach this conclusion.  Those reviewed cases (i) are not
antithetical to the concept of an FMV credit *sub judice,* (ii) but for *Summit Trust Co.*, all predate the 1992
rule changes, and (iii) in no way center on R.4:65-5 as an absolute procedure (indeed, one is left to a
reading of the cases to find R.4:65-5 or its predecessor as a fact and/or topic).  And, without explanation,
*Borden* simply fails to consider or even reference *Resolution Trust Corp. v. Berman Indus., Inc.*, 271 N.J.
Super. 56 (Law Div. 1993), a case plainly reflecting *Citibank* and the then newly adopted R.4:64-5,
allowing an FMV defense to a Superior Court of New Jersey, Law Division deficiency action.

of foreclosure. He knew [the obligors on the note] had a right under *Rule* 4:65-5 to object to the sale within ten days if the property sold for less than [Borden's submitted] appraisal. He knew or should have known that [obligors] had a right to a deficiency hearing under *DeMarco* and its progeny. Finally, he knew no separate lawsuit on the note after the sale was possible because all claims respecting the note and guaranties had been determined. Defendant required no further relief from the court save execution and levy on personal assets and income if any was ever discovered.

It is in this context that we must construe the phrase, "Motion denied but in any deficiency action defendants will be entitled to [an FMV] credit." We are satisfied that the second judge read the word "action" too literally. It is clear that plaintiffs had an equitable, although not a statutory, right to a *Lowenstein* FMV hearing under *DeMarco, supra,* 44 N.J. at 535 . . . The judge knew, or should have known, that "the forum for such relief should be only the foreclosure action by the procedure of objection to the sale."

*Id*. at 590-91. The trial court's order of expungement of the judgment was thus *reversed* in *Borden*.[27]

In disagreeing with *Citibank*, the *Borden* appellate panel differed with two of the positions of the 1991 panel. First, it called into question *Citibank's* statement that it would not be error to allow a *Lowenstein* hearing in a subsequent deficiency action following sale and expiration of the sale objection period. Then, *Borden* took issue with Citibank's point "that asserting a right to an FMV hearing 'in a foreclosure proceeding would be premature.'" *Id*. at 591. Yet *Borden* adds an important qualification to its *contra-Citibank* positions: the discord exists "*at least where the guarantors were parties to the proceeding on the notes and mortgages*." *Ibid*. Of course, there could be no such joinder of personal liability on the note (as to any obligor) without court approval given R.4:64-5 as implemented shortly *after* the *Borden*

---

[27] The *Borden* court then offered an alternative basis for its decision: even if the attempted FMV hearing were considered to be timely, the obligors' expert "could not determine an FMV" and thus the $640,035 sale price to the third-party bidder "was determinative of the FMV." *Id*. at 592-93.

complaint was filed and as spurred on by *Citibank*.  Hence, this bankruptcy court reads *Borden*, *at least as it relates to the matter at bar,* to be something of a vestige.  It emanates from a complaint filed barely post-*Citibank* but pre-R.4:64-5 and related rules and comments.  *Citibank,* on the other hand, tapped into the main *substantive* vein of *79-83 Thirteenth Ave.* and then confronted procedure in a manner which was endorsed by the rulemaking process.

### E.  Commercial Mortgage Note Enforcement Options; Related Execution Sale Law

*Borden* does provoke thought regarding this area of mortgage law.  If contrary to the facts in *Borden* a commercial note holder brings its foreclosure action first but no personal judgment is rendered at the time of the foreclosure judgment, who must initiate the post-sale deficiency action, and is there a time limitation for the taking of such action?[28]  At present, there is no well-defined approach to concluding matters of deficiency and FMV credit under these circumstances.  Given the claim joinder restrictions of R.4:64-5, a reasonable process *could* reflect the residential deficiency action requirement of N.J.S.A. 2A:50-2.  "The action for deficiency shall be commenced within 3 months of the date of sale. . . ."[29]  It seems clear, and was historically the case, that such actions are to be initiated by the mortgagee.  Then FMV could be asserted, much as provided for in residential foreclosures per N.J.S.A. 2A:50-3.  Deficiency/FMV disputes would be resolved by evidence of market value, essentially through appraisals.  This procedure does *not* call for an "unwinding" of the sheriff's sale.  That eventuality could continue to remain with the short-fused objection process of R.4:65-5.[30]  Thus, purchasers at those sales (particularly third parties) are reasonably protected.  Such protection

---

[28] Should the answers be a function of whether a third party purchases at the sale and/or whether there is active bidding?  Whether court or legislative relief is available based only upon the "windfall" potential in the note holder, or includes repose of debt considerations, is open to debate.

[29] See the limitations-saving provision of N.J.S.A. 2A:50-2.1.

[30] *See Brookshire Equities, LLC v. Montaquiza*, 346 N.J. Super. 310  (App. Div. 2002)  (authored by J. Petrella, as was *Citibank).*

would give some recognition to the *79-83 Thirteenth Ave.* concern for the remedy of resale

"which could not well be done months or even years later by the law court in a deficiency suit."

44 N.J. at 535.  By rule and/or legislative adjustment,[31] the deficiency action could be directed to

the court rendering the foreclosure judgment by a permitted supplementary pleading process or

otherwise.  In any event, since no personal liability has been established before sale in this

scenario, deficiency would have to be sought within a reasonable period or abandoned.  It is

emphasized that this type of procedure would preserve the option in commercial mortgage note

holders to sue first on the instrument, an option at purposeful variance from the residential note

restriction of N.J.S.A. 2A:50-2.  This would be compatible with R.4:64-5 (as adopted in 1992),

as contrasted with the rejected proposal of 1969.

Another commercial mortgage note enforcement variation could develop.  Per R.4:64-5

the Chancery judge in a foreclosure could see fit to allow the otherwise non-germane personal

claim on the note as part of the complaint.  Under these circumstances that same judge would

appear to have discretion to enter both the foreclosure and the personal judgment but define by

order the process for accommodating an FMV hearing following sheriff's sale.[32]  Here, again,

taking a page from N.J.S.A. 2A:50-2 and 3 would make sense.

A third circumstance which should be anticipated is a suit and *judgment on a commercial

mortgage note*, followed by either a foreclosure and sale[33] or an execution on the judgment and a

resulting sale.  Is a ten-day limit for a value-based objection to sale in the foreclosure alternative

---

[31] Consideration of the substance-procedure divide (and its implications for rule making and legislation) as it applies to an FMV hearing is beyond the scope of this opinion.

[32] Consider the 1995 order in *Borden* as well as the interpretation given to it by the "second" Chancery judge in that case.

[33] *See generally* as to issue preclusion *First Union Nat'l Bank v. Penn Salem Marina, Inc.,* 190 N.J. 342 (2007); *see also Summit Trust Co. v. Willow Bus. Park L.P.,* 269 N.J. Super. 439 (App. Div. 1994) (under circumstances where the commercial mortgage note is sued on *without foreclosure*, no FMV credit or prior foreclosure is required).

fair (assuming that the remedy being sought by the judgment debtor is not to set aside the sale, but to garner an FMV hearing to admeasure remaining debt on the judgment)?  Efforts will inevitably be made to apply *Borden* strictly here (where it is less incompatible with existing rules and *Citibank*[34]*).*  Prayers for relief from the strictures (as read by *Borden*) of R.4:65-5 based upon equitable grounds (not the least of which would be the fundamental policy against supersatisfaction where mortgagees purchase at sales) would likewise be inevitable.  It is also conceivable that the ten-day objection period rule, under certain circumstances and where the foreclosing judgment creditor gets a vast windfall via a nominal winning bid at the sale, offends due process as well as fundamental fairness.  Rather than simply letting potentially chaotic situations[35] unfold, FMV hearing rules or legislation should be considered.[36]  Recall, *79-83 Thirteenth Ave.* expressed specific concern for this "note-judgment first" possibility where the note holder acquires the targeted "property at the judicial sale for a nominal figure (if there are no other bidders), and still collect[s] the full deficiency . . . during the next 20 years."  44 N.J. at 533.  Hence, the potential for an unjust supersatisfaction of debt should be offset by changes in regulation.  Such concern should transcend the full range of sheriff's sales, not just sheriff's sales arising from mortgage notes and foreclosure.  Indeed, *79-83 Thirteenth Ave.* as read through the

---

[34] Once personal liability is established, as in this "note-first suit" scenario, the FMV allegation as a personal defense is arguably "delinked" from the process of establishing that liability and thus differs structurally from *Citibank*.

[35] The execution/judgment sale possibility, not expanded upon above, includes an  imponderable, *i.e., sale of the mortgaged property subject to the mortgage* held by the judgment creditor.  Similarly, nuances to the three variations set forth herein, as well as other scenarios, are bound to develop.  Consider, *e.g.*, the available option to engage in simultaneous (but separate) actions, one on the note and one in foreclosure.  *See* 30A *New Jersey Practice, Law of Mortgages*, § 39-19 (October 2010 p. part) at 3.  Presumably this approach differs from joinder of claims under R.4:64-5 where permitted by court order.  All of this will test any future remedial enactment or rule for fairness, good sense and complete thinking.  *Compare and contrast* the *Restatement of Property (Mortgages)* § 8.2 (1997) which, like New Jersey in the commercial context, does not require foreclosure first, but unlike New Jersey, limits the options to suit on the note *or* foreclosure, but not both.

[36] Again, a variation of N.J.S.A. 2A:50-2 and 3 could be developed for this situation.

lens of *Citibank* has influenced nonforeclosure judgment execution sale deficiency claims both in terms of substance and procedure.

That influence is evidenced in *MMU of New York, Inc. v. Grieser,* 415 N.J. Super. 37 (App. Div. 2010), *decided four months after Borden.*  This opinion succinctly states the issue to be decided and its conclusion as follows:

> The primary issue presented by this appeal is whether a judgment debtor is entitled to a fair market value credit for property that is executed upon and then purchased by a judgment creditor at a sheriff's sale for a nominal amount.  We conclude that, even in the absence of express statutory authorization, a court has inherent equitable authority to allow a fair market value credit in order to prevent a double recovery by a judgment creditor against a judgment debtor.  We also conclude that this inherent authority was properly exercised in the present case.

*Id*. at 40.  The case included a default judgment against Grieser for more than $1.6 million, entered at some time after October 1991.  In 2000 MMU levied execution on Grieser's after-acquired real property, scheduled a sheriff's sale, and successfully defended a Grieser-instigated order to show cause to stay the sale and vacate the default judgment.  Grieser appealed and lost.

The sheriff's sale in September 2001 resulted in MMU's purchase for the nominal sum of $100.  MMU quickly contracted to sell the property for $1,200,500 *and* collected $188,944 from other properties owned by the defendant.  Again, Grieser challenged (by motion) the validity of the default judgment; after being denied at the trial level, Grieser successfully appealed.  On remand, following certain reductions, the judgment was amended to $643,134.60.  Against this amended amount, Grieser was credited with the $1,200,500 realized from MMU's resale (as well as other credits), all resulting in a substantial judgment in his favor.  On the appeal, which generated the recent opinion, it is the granting of the FMV credit of $1,200,500 that was at issue.

After the Appellate Division dispensed with the plaintiff's laches argument, the sheriff's sale and FMV credit were addressed.  *No reference is made to the R.4:65-5 ten-day objection period as a limitation upon seeking FMV credit under these circumstances, or to any requirement that the FMV credit claim must be embodied in that rule's objection process.*  Nor is *Borden* cited.[37]  Yet, the foreclosure sale precedent of *Citibank* was substantially relied upon here in allowing the FMV credit.  *Id.* at 46-48.[38]

### F.  Case Law Has Consistently Supported FMV Hearings to Avoid Windfall

*Resolution Trust Corp. v. Berman Indus., Inc.,* 271 N.J. Super. 56 (Law Div. 1993), previously cited for its conspicuous absence from *Borden*, supports the right to an FMV hearing in circumstances similar to the matter at bar.  Davis, a commercial mortgage loan guarantor, was targeted by the lender's successor (the "RTC") in a deficiency suit following a foreclosure judgment and sale of the mortgaged property.  The RTC acquired the property at the sheriff's sale with its $100 bid though the property's appraised value, known to the RTC, was $375,000.  Davis, however, was not joined in the foreclosure action.

The case is particularly instructive because of its place along a time line in the development of current law and rules.  The *RTC* decision issued on October 28, 1993.  By that time *Citibank* and the then-new R.4:64-5 and rule commentary were well established as, in effect, progeny of *79-83 Thirteenth Ave.*  Heavily relying on those cases, and discounting the RTC's claim that *Citibank* did not apply to *guarantors*, the court held:

---

[37] The *MMU v. Grieser* appellate panel stressed equity's abhorrence of a windfall, the fundamental principle to disallow supersatisfaction of debt.  *Id.* at 48.  Again, *Borden*, involving a public sale to a third party (and for other than nominal value), was different in these regards.

[38] Also cited in *MMU* in support of FMV credit to offset a windfall are: *Morsemere, supra* (a 1986 Appellate Division opinion, relied upon in *Citibank*, where a non-mortgage judgment creditor was the successful bidder at a foreclosure-based sheriff's sale, the debtor had the right to dispute a claim of deficiency via an FMV hearing); and *Smith v. Lopez*, 304 N. J. Super. 26 (Ch. Div. 1996) (*citing Morsemere* and *Citibank*, a $100 purchase by the judgment creditor at the sheriff's sale of a car generated a right in debtor to a credit of the price received by the judgment creditor upon her resale to a dealer).

> In this case, the mortgage debt is over $640,000. The sheriff's sale realized $100, bid by the plaintiff. The RTC's appraisal obtained approximately four months prior to the sheriff's sale, valued the property at $375,000. Under these circumstances, to deny Davis the opportunity for a fair market value credit merely because he is a guarantor on a note secured by commercial property would be to elevate form over substance. In this case, equitable principles preclude such a result.

*Id*. at 65.  In working its way to this conclusion, the court placed R.4:64-5 at the center of its rejection of one of Davis' defenses, as follows:

> Davis's fourth separate defense asserts the entire controversy doctrine as a bar to the litigation. *Rule* 4:64-5 specifically precludes the joinder of non-germaine [sic] claims, such as those arising under guarantees, in proceedings for the foreclosure of mortgages. A foreclosure action is purely quasi in rem, affording relief only against the secured property. A suit on the bond or note, however, is in personam. A foreclosure judgment is res judicata as to the amount of the unpaid obligation secured by the mortgage, but not as to an obligor's liability for any deficiencies. . . . Accordingly, there is no legal basis upon which this defense may be legitimately asserted.

*Id*. at 62-63 (citation omitted).

Built on the foundation of *79-83 Thirteenth Ave.* and *Citibank*, *RTC* promptly served to support the FMV concept in two $100 nominal bid cases.  In the 1995 case of *Connecticut Gen. Life Ins. Co. v. Punia*, 884 F. Supp. 148 (D.N.J. 1995), following a foreclosure sale of real property worth approximately $5 million to the lender for the $100 bid, FMV credit was granted to guarantors who were being sued for the entire mortgage loan debt.  *Id*. at 151.  Then, in 1996, an FMV credit right was recognized after a judgment execution sale to the executing creditor at a nominal $100 price (for personalty).  *Smith v. Lopez*, 304 N.J. Super. at 30-33.  Reliance on this foundation has extended to the present.  *See, e.g., In re Denaro*, 383 B.R. 879, 884-87 (Bankr. D.N.J. 2008) (contrasting *Connecticut Gen.* as a nominal bid case with the active bidding in

*Denaro*, and determining that the lender's successful credit bid of $401,000 was FMV, as compared to the allegation of FMV via appraisal at $750,000).  Indeed, the nominal purchase by a foreclosing mortgagee, as an "of course" proposition in New Jersey, had generated a mortgagor's right to a fair market value hearing even before the *Citibank*/rule change era.  *See, e.g., Hudson City Sav. Bank v. Hampton Gardens Ltd.*, 88 N.J. 16, 25 (1981).  That right remains embedded in current law, *post-Borden*.  The *MMU* Appellate Division decision of August 4, 2010 evidences the applicable law's enduring abhorrence of the windfall inherent in nominal value purchases at sheriff's sales by either executing or foreclosing creditors.[39]

## III.    THE CASE AT BAR

### A.  In the Case at Bar, Distinguishable from *Borden,* Persisting New Jersey Precedent Requires an FMV Hearing

The matter at bar differs substantially from *Borden*, to wit:

(i)    No third-party purchase developed at the sheriff's sale *sub judice* – indeed, only nominal value of $100 per property was "paid" by the acquiring mortgagee and thus the bank argues for a windfall;[40]

(ii)    No personal liability – that is a personal judgment – was issued against note obligors here (this being consistent with non-joinder of non-germane claims per R.4:64-5);[41]

(iii)    Rule changes and a near-generation old and continuing rule comment at R.4:65-5 ("failure to object to the sale price [per this rule] will not preclude" an FMV claim in a subsequent deficiency suit) have changed the legal landscape *after 79-83 Thirteenth Ave.* and

---

[39] *See Carteret Sav. & Loan Ass'n, F.A. v. Davis,* 105 N.J. 344, 351 (1987) (detailing the disconnect between foreclosure sales and fair market value).

[40] In *Borden* a third party (the rent receiver) purchased for $640,035 subject to tax arrears.

[41] In *Borden* personal claims on the mortgage note were pled in the foreclosure action and judgment issued.

after the *Borden* complaint was filed, at least as to foreclosure cases where no personal

judgments have been entered;

(iv)    All parties-in-interest are well aware that the foreclosed and sold

properties had combined value of at least hundreds of thousands of dollars, appraisals having

been developed in or around the time of the sale as commissioned by both sides; in fact, one

property generated substantial casualty loss insurance proceeds shortly after the sale; and

(v)    The sheriff's sale here (September 8, 2010) was not a matter of ancient

history.[42]

Quite independent of the overriding bankruptcy aspects of this matter (addressed

hereinafter), this court finds and determines that New Jersey law would not deny the debtor and

her co-obligor an FMV hearing (and credit) under the circumstances of this dispute.  Such a

determination does not require this court to choose between decisions of two New Jersey

Superior Court, Appellate Division panels (*Borden* versus *Citibank*) in a disagreement over the

law of mortgage foreclosure sales.[43]  Rather, as set forth above, *Borden* can readily be

distinguished on its facts from the current plight of the Karagiannis family.  *Borden*

acknowledges that its *contra-Citibank* position could well be limited to situations where

---

[42] The *Borden* case began in December 1991, the sheriff's sale was held March 1, 1995 and the recovery efforts by Cadles were initiated after 2007.

[43] *But see* the rule-based progeny of *Citibank* (including nearly twenty years of "official" comments) as it relates to FMV hearings.  Concepts of fundamental fairness and general equitable principles should be applied.  In New Jersey they have been applied to prevent windfall recoveries by mortgagees and corresponding unfair judgments against commercial mortgage note obligors following mortgage foreclosure sales.  A ten-day period of limitations per R.4:65-5 cannot obliterate these basic notions of fairness.  Consider, in a related circumstance, the worthy and thoughtful approach of Judge Dreier and his panel colleagues in *Sovereign Bank, FSB v. Kuelzow*, 297 N.J. Super. 187, 195 (App. Div. 1997) ("While one goal of litigation is finality, the basic goal is a just resolution of the dispute.  Fairness takes precedence over the closing of cases").

personal liability on the mortgage note has already been adjudged.[44]  Moreover, in its alternative

determination, the inadequacy of proofs of FMV was stressed.[45]  In addition, *Borden* was not a

case involving a windfall to the purchasing creditor.  This court believes that, faced with a

nominal bid and purchase by the foreclosing party, *Borden's* broad and repeated recognition of

the "fundamental principle" that "a mortgagee is not entitled to recover more than the full

amount of the mortgage debt"[46] would impel the *Borden* panel to grant the equitable relief

contemplated in *79-83 Thirteenth Ave.*  This would lead to the weighing of the *79-83 Thirteenth

Ave. acquiescence* to R.4:65-5 process against the aforesaid bedrock principle, and ultimately to

the subordination of process considerations in favor of time-honored basic fairness.  *See*

R.1:1-2(a) as to construction and relaxation of the relevant Court Rules which "shall be

construed to secure a just determination, simplicity in procedure, fairness in administration and

the elimination of unjustifiable expense and delay. . . ."  *See also* R.1:3-4 regarding

enlargement of time.  Such would be the case even if *Borden's* disagreement with *Citibank* were

to remain intact.

   And, whether *Citibank* was right or wrong at the time of its decision interpreting and

applying *79-83 Thirteenth Ave.,* the Court Rules and Comments which *Citibank* generated were

simply not considered in *Borden.*  The matter at bar plainly requires such consideration.   In the

final analysis, both New Jersey case law and court rules, marshaled appropriately, support Ms.

Karagiannis' FMV hearing right.

---

[44]"[N]or do we agree that asserting a right to an FMV hearing 'in a foreclosure proceeding would be premature,' [quoting *Citibank*], *at least where the guarantors were parties to the proceeding on the notes and mortgages.*"  412 N.J. Super at 591 (emphasis added).  *But see* R.4:64-5.

[45] "Even if we were to consider plaintiffs' belated attempt to trigger an FMV hearing as timely, they chose to rely on an expert who testified that he could not determine an FMV."  412 N.J. Super. at 492.

[46] 412 N.J. Super. at 582-83 (quoting *79-83 Thirteenth Ave.*, 44 N.J. at 534)*; see also id.* at 587, 589, and 592.

## B. **Bankruptcy Aspects as Overriding**

When stay relief was granted permitting the bank to go forward with the sheriff's sale of

two of the debtor's four properties, the clear purpose was to remove those properties from her

estate in bankruptcy, to net the value of the two properties against the blanket mortgage debt,

and *thereafter* to gauge the prospects for Ms. Karagiannis' financial rehabilitation potential in

bankruptcy. Could she save the house she and her mother co-owned and lived in, as well as the

building housing a family business (a tavern)? At the hearing on the stay relief motion on July

15, 2010, this approach was discussed and approved. *See generally* Transcript of July 15, 2010

("T") at 4:4-11:10.[47]

---

[47]
    THE COURT: Let me try this on. And, you know, again, with great
    respect to diligent counsel, you're probably way ahead of me, but what
    I'm hearing is, the future of these people is in two properties. Okay? The
    residence and the business.

    MR. ROTH [for the debtor]: Correct, Judge.

    THE COURT: Is there an interim, I emphasize that, an interim
    compromise where the other two properties, the rental properties, can go
    by way of what you want, right now, boom, gone. And a fair adjustment
    made.

T.6:2-11.

    THE COURT: Let me try this. I don't want to make it worse, rather
    than better. So, I'm willing to do this. Express a tendency not
    irrebutable, you know, if somebody wants to argue against it, but my
    tendency would be to, at some point in time, if not today, within a very
    short period of time, the next Chapter 13 day, give relief from the stay on
    the two investment properties. If I could feel reasonably confident that
    either in a 13 or an 11, there'd be some opportunity to save the balance.
    It would be best if it were in a 13, if possible. If some notion of
    conclusion by way of eliminating deficiency and agreeing and what the
    debt attributable to these two properties would be, so that we've got a
    workable number in either a 13, which, again, I think would be better, or
    the more expensive 11, for the balance of the two properties. Now, that
    gives you some time between now and the 2nd or the 5th of August.

T.8:23-9:14.

The tenor of the July 15, 2010 hearing, and the limitation of the stay relief order to the two properties less vital to the debtor and her mother, evidences this court's contemplation of a netting of fair value of those properties against the blanket debt due Crown Bank.  Indeed, a dispute already persisted in this court as to the value of each and every property as manifested in the 2010 stay relief motion.  The Bankruptcy Code and process were thus already fundamentally implicated in this property value dispute.  *See* 11 U.S.C. § 362(d)(2).  Hence,

---

THE COURT: August 5th. To try to come to terms. I wouldn't do it this way if I didn't have confidence in both attorneys. You know, you know what you're doing better than I do. I think you -- give it one last college try.

And, so the bank won't feel that, you know, they're just going to have another hope session and not have any relief. They'd get the two properties, boom, but the numbers have to be worked out, because as I understand it, it's a blanket mortgage over the four.

MR. CAMPBELL [for the bank]: Well, you have two loans cross collateralized.

THE COURT: Exactly.

MR. CAMPBELL: Correct. So, you know, if the stay were lifted to these two apartment rental properties, stay is lifted, foreclosure or their surrender for whatever value and we figure out the numbers.

THE COURT: But the value has -- that's what has to be figured out. That's what you want.

MR. ROTH: Exactly, Judge.

THE COURT: But, I leave that to the two of you, as reasonable people to work out. So, can I adjourn this to the 5th of August, with that kind of program in mind?

MR. CAMPBELL: Yes, Your Honor.

MR. ROTH: That's agreeable to me, Judge.

THE COURT: Okay.

T.9:18-10:17.

assumed but not articulated in the stay relief order, determination of fair value would await the results of the sheriff's sale. *And, that determination would be made in this court as part of the ongoing bankruptcy case*. It was never contemplated that value would be litigated through the foreclosure objection to sale process of R.4:65-5. Rather, issues of value were already before this court, put in issue initially by the bank itself. *For this reason alone, the debtor is entitled to a hearing to determine that value*.

Put somewhat differently and moving along a time line from the bank's 2010 motion to the current motion, relief from the stay as to the residence and tavern property also requires a fair value hearing in bankruptcy. Issues of remaining debt (in effect, "deficiency") after the bank took two properties for nominal value remain part of the 11 U.S.C. § 362(d) process set in motion by Crown and ongoing throughout this bankruptcy case.

Similarly, Crown raised in June 2010 and now again raises 11 U.S.C. § 109(e) qualification issues relating to secured (and presumably unsecured) debt *amounts*. *Crown*, in fact, seeks as an alternative remedy, *conversion* of the case to Chapter 11. That request generates valuation issues.[48] In addition, case conversion to Chapter 11 (if it should be

---

[48] Decision on Crown Bank's motion to convert this case (to Chapter 11 or Chapter 7), or for dismissal, will be deferred. While it is standard and generally appropriate to measure § 109(e) qualification for Chapter 13 at the petition date, this case could justify exceptional treatment. It was clear from outset that the debtor's commercial properties were to be sold as part of the plan; the bank's near-immediate stay relief motion, the order for relief, and the anticipated foreclosure sale (already "teed up" prepetition) could be related back to the petition date. If this were done, and the bank's appraisals of value were applied to the secured debt total, the thought-to-be excessive secured debt of $1,351,281.49 would be reduced in a hypothetically amended petition to $746,281.49 (crediting the bank's own valuation of $605,000 for the foreclosed properties). It appears as though would-be secured debt, rendered unsecured by using a § 506(a) analysis and the bank's appraised values for the two remaining estate properties (a total of $600,000), is $146,281.89. If the s*cheduled* unsecured debt ($42,316) were added to this figure, the total of $188,598 would be well below the unsecured debt limit of $360,475 of § 109(e). Secured debt would be $600,000, again substantially below the $1,081,400 permitted by the Code for Chapter 13 qualification. Whether this analysis will be deemed appropriate (and, further, whether the stated values are valid for use in the analysis) is left for further input from counsel and will abide the event of the ordered FMV hearing. In any event, this court views the debtor as a good faith filer having potential for financial rehabilitation, whether her case remains in Chapter 13 or is to be converted to Chapter 11, or

determined that § 109(e) disqualifies the debtor for Chapter 13) or Chapter 13 continuation

require development of rehabilitation plans.  These plans implicate *the claim objection process*

which has already been previewed in the stay relief motions put before this court by Crown

Bank and, as to values, disputed by the debtor.  *See* 11 U.S.C. §§ 502 and 506(a).  *Again, the*

*equivalent of an FMV hearing in this case is a bankruptcy process imperative.*[49]

## IV.  <u>CONCLUSION</u>

Ms. Karagiannis is entitled to an FMV hearing to determine the value of the two

properties acquired at the September 8, 2010 sheriff's sale by Crown Bank for nominal bids of

$100 per property.  That right is well defined in the applicable law, *i.e.*, that of New Jersey.

*See, inter alia, Citibank, N.A. v. Errico*, the 1991 Superior Court, Appellate Division case which

has both interpreted the 1965 New Jersey Supreme Court opinion in *79-83 Thirteenth Ave. v.*

*DeMarco* and prompted rule changes and commentary enhancing FMV hearing rights in

commercial mortgage note obligors such as the debtor *sub judice*.  In particular, R.4:30A

("Entire Controversy Doctrine"), R.4:64-5 ("Joinder of Claims in Foreclosure"), and R.4:65-5

"Sheriff's Sale; Objections"), read together, support the FMV hearing right of Ms. Karagiannis,

---

whether she be allowed and/or required to take a dismissal and refile with a new petition reflecting the
sale of two properties and an FMV credit against the Crown Bank debt.  Involuntary conversion to
Chapter 7 at this time would seem harsh given the debtor's potential to save the residence through a
reorganization.

[49] *Fed.R.Bankr.P.* 3012  ("Valuation of Security") provides for a valuation hearing for a purported
secured claim, as follows:

> The court may determine the value of a claim secured by a lien on
> property in which the estate has an interest on motion of any party in
> interest and after a hearing on notice to the holder of the secured claim
> and any other entity as the court may direct.

By filing a proof of claim Crown has "trigger[ed]" the claims allowance process and submitted to the
equitable power and jurisdiction of this court.  *Langenkamp v. Culp*, 498 U.S. 42, 44-45 (1990);
*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 58-59 and n.14 (1989); *Katchen v. Landy*, 382 U.S. 323,
336 (1966).

34

notwithstanding her failure to object to the sale per R.4:65-5.  Comment 1 to R.4:65-5, a

constant since 1992, advises that "a mortgagor's failure to object to the [sheriff's] sale price will

not preclude him from claiming, in a subsequent deficiency suit, that the price is below fair

market value."  The 2010 Appellate Division opinion in *Borden v. Cadles of Grassy Meadows

II, LLC,* factually distinguishable from the matter at bar and not reflective of rules of court and

commentary prompted by *Citibank*, does not require denial of the FMV hearing right to the

debtor *sub judice*.

Crown Bank's motion for stay relief as to the debtor's residence and business-occupied

property must be denied because the debt due the bank is a function of a yet-to-be-determined

FMV credit due Ms. Karagiannis.  She is entitled to a credit of far more than the nominal bid

amounts (as was posited by Crown in reliance on *Borden*); in fact, she claims a credit based

upon her appraisals at the time of the sale of $1.165 million, an amount which would greatly

reduce the bank's $1.3 million claim against her and the remaining estate properties.

Given the debtor's status in bankruptcy and the history of this Chapter 13 case, there are

bankruptcy implications consistent with those of the applicable law but serving as an

independent ground for recognizing an FMV hearing right in the debtor.  Whether by applicable

New Jersey law or by bankruptcy law, and in order to prevent a windfall in favor of the bank at

the expense of Ms. Karagiannis, an FMV credit against her commercial mortgage note

obligation is due the debtor for the foreclosed and bank-acquired properties.

Decision on the balance of the relief sought in Crown Bank's motion, *i.e.*, conversion of

the case to either Chapter 7 or Chapter 11, or its dismissal, shall be deferred until after the FMV

determination.  An FMV hearing will be scheduled.

The court has this date entered an order implementing its decision.


Dated: May 5, 2011                    __/s/MorrisStern_____
                                      MORRIS STERN
                                      United States Bankruptcy Judge